UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

BRENDA CURTIS,                           )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )   CASE NO. 4:07-cv-0148-DFH-WGH
                                         )
MICHAEL J. ASTRUE, Commissioner of       )
the Social Security Administration,      )
                                         )
            Defendant.                   )

ENTRY ON JUDICIAL REVIEW

Plaintiff Brenda Curtis seeks judicial review of a decision by the
Commissioner of Social Security denying her claim for disability insurance
benefits under the Social Security Act.   Acting for the Commissioner, an
Administrative Law Judge ("ALJ") determined that Ms. Curtis suffered from
narcolepsy and degenerative disc disease but was not disabled under the Act
because she could perform medium work with certain environmental protections.
The ALJ's decision is not supported by substantial evidence.  The ALJ failed to
consider adequately the evidence showing the severity of Ms. Curtis' narcolepsy.
The evidence from Ms. Curtis' treating physicians, who specialize in treating sleep
disorders, shows that they have been unable to control her condition so that she
would be able to stay awake for a full day's work.   The court has considered
whether the record is so lopsided that the court should simply order an award of
benefits from December 15, 2004 through at least the date of the ALJ's decision

on March 5, 2007.  The question is close, but the court concludes that the better approach here is simply to remand for further consideration of all the evidence of plaintiff's narcolepsy, with full appreciation for the severity of the condition despite years of treatment that left her doctors suggesting that she resort to experimental drugs.

*Background*

Ms. Curtis was born in 1961 and was forty-six years old at the time of her administrative hearing.  She is a high school graduate who has worked primarily as a mail clerk with an occasional appointment as a substitute teacher's aide.  R. 76.  She was first diagnosed with narcolepsy in 2000 and stopped working on January 6, 2003.  R. 75.

Ms. Curtis filed her claim in this case on March 4, 2005, alleging "narcolepsy & restless legs syndrome, fibromyalgia, chronic fatigue, chronic sinusitis and chronic bronchitis, neck/upper back & shoulder injury, inflammatory neuropathy due to toxic exposure, interstitial cystitis, extreme environmental sensitivity, hypersensitive reaction – asthma follows, irritable bowel syndrome."  R. 74-75.  She had previously filed an application for disability insurance benefits based on similar maladies on May 29, 2003, but that application was denied by a different ALJ on December 14, 2004.  R. 38-44.

Ms. Curtis has suffered from a number of impairments, but the only one that is serious enough to present an issue under the strict disability standard of the Social Security Act is her narcolepsy.  Her request for judicial review focuses exclusively on the ALJ's consideration of her narcolepsy, so the court focuses on the evidence of that condition.

Ms. Curtis was first diagnosed with narcolepsy on September 12, 2000, by Dr. Walter App of the Audubon Hospital Sleep Disorders Center.  R. 228.  The diagnosis came after a multiple sleep latency test on September 6, 2000 that revealed an average sleep latency of three minutes.  R. 208.  The multiple sleep latency test is the general test used as part of the diagnosis of narcolepsy.  The study is conducted during the daytime and measures how long it takes a person to fall asleep, the patient's sleep latency.  Sleep latency is measured in four or five separate twenty-minute napping phases throughout the day, and that sleep is measured for signs of REM sleep, which indicates narcolepsy.  The more quickly the patient falls asleep, the more severe the symptoms of narcolepsy.  Any result below five minutes shows the potential for serious sleep problems, and the average narcoleptic patient has a sleep latency of about three minutes.  Donna Arand, Ph.D, Michael Bonnet, Ph.D, Thomas Hurwitz, M.D, Merrill Mitler, Ph.D, Roger Rosa, Ph.D and R. Bart Sangal, M.D, *The Clinical Use of the MSLT and MWT*, 28 Sleep 123 (2005), available at http://www.aasmnet.org/Resources/ Practice Parameters/Review_MSLTMWT.pdf (last visited Nov. 3, 2008).

Ms. Curtis was prescribed Provigil, a drug for the treatment of narcolepsy. By her own account, the narcolepsy was under control for the next year, but she returned to Dr. App in January 2002 when she felt her Provigil was not working. Over the next several years, she met with Dr. App on multiple occasions and was prescribed Vivactil, Ambien, and Ritalin.  R. 191-206, 228-229.  On January 5, 2005, Dr. App wrote a letter stating his diagnosis, her prescription regimen, and his belief that Ms. Curtis "is effectively disabled by her condition."  R. 197.  At that time, Dr. App was the only sleep specialist whom Ms. Curtis had seen for diagnosis or treatment.

On May 23, 2005, Ms. Curtis was sent for a consulting examination with Dr. Robert MacWilliams, who is not a sleep specialist.  Dr. MacWilliams did an internal medicine exam specifically geared toward narcolepsy and fibromyalgia, but also addressing a number of Ms. Curtis' stated conditions.  Regarding  the now-critical narcolepsy issue, Dr. MacWilliams stated that Ms. Curtis had an "unconfirmed history of narcolepsy."  Most important, he noted that he had no record or communication regarding narcolepsy from her physician.  Dr. MacWilliams then made two observations.  First, Ms. Curtis had no episodes of narcolepsy during her time at his office.  Second, Ms. Curtis still continued to drive, so "her physician apparently does not feel this to be a serious issue."  R. 298.  Dr. MacWilliams' final assessment was that Ms. Curtis could perform medium work eight hours per day.

The next month, June 2005, Dr. B. Whitley performed a physical residual functional capacity assessment.  Dr. Whitley reviewed the medical file and found slight restrictions for how much weight Ms. Curtis could lift.  He marked that she could stand or sit for six hours in an eight hour workday.  The only other limit mentioned was avoiding concentrated exposure to fumes, odors, dusts, and hazards such as machinery and heights.  R. 341-349.  On November 8, 2005, a Dr. Ruiz affirmed this assessment.  Neither Dr. Whitley nor Dr. Ruiz indicated any consideration of Ms. Curtis' narcolepsy.

In 2006, Ms. Curtis sought other treatment options for her narcolepsy.  Her general practitioner, Dr. Daniel Kantz, referred her to Dr. Mohammed Hasnain, a neurologist specializing in sleep disorders.   Dr. Hasnain cited symptoms consistent with narcolepsy including "hypnagogic hallucinations, sleep paralysis, and excessive daytime somnolence."  R. 377.  He prescribed Prozac, an anti-depressant that helps some narcolepsy patients, and ordered a new multiple sleep latency test.  He also reported Ms. Curtis'  symptoms as described in May 2006. He noted that Ms. Curtis complained her daytime somnolence was "now worse than ever" and that she took naps at noon and 5:00 p.m. but still felt sleepy.  R. 378.  The new sleep latency test was performed on May 23, 2006.  In the 2000 test, Ms. Curtis' average sleep latency had been three minutes.  The 2006 test showed an average sleep latency of just 45 seconds.  R. 374.[1]

---

[1]The record is confusing about where the correct second multiple sleep latency test can be found.  The record includes two separate studies on May 23, (continued...)

Ms. Curtis next went for a second opinion to Dr. Eugene Fletcher on July 26, 2006.  He confirmed Dr. Hasnain's findings but recommended delaying the administration of Prozac in favor of increasing her dosage of Provigil first.  R. 380.

The final doctor to see Ms. Curtis for narcolepsy was Dr. Vasudeva Iyer who first evaluated Ms. Curtis on December 1, 2006.  Dr. Iyer agreed with the diagnoses of narcolepsy and noted the diminishing returns of the various prescription drugs.  He recommended a more frequent napping schedule and added to her regimen the drug Adderall, an attention-deficit drug sometimes thought to help narcoleptics.  This appointment was the final appointment in the record on the day of the hearing before the ALJ.  R. 414-15.

After the ALJ's denial of benefits, Ms. Curtis submitted additional information to the Appeals Council on May 8, 2007.  These included records of an additional meeting with Dr. Iyer on January 19, 2007, where the drug Xyrem was prescribed due to continued sleepiness in the morning.  R. 418.  On April 27, 2007, Dr. Iyer again saw Ms. Curtis and determined that, due to the inefficacy of

---

[1](...continued)
2006, attributed to a Brenda Curtis in the medical records provided by Dr. Hasnain.  The first one lists an average sleep latency of 1 minute 37 seconds, while the second lists an average sleep latency of 45 seconds.  R. 369, 374.  The hearing before the ALJ included much discussion about what was the correct study, marked as Exhibit B26F, and the ALJ accepted that the test showing a sleep latency of 45 seconds was correct.  R. 437.  The results of this study can be found at R. 416-17.  The court ignores the study found at R. 369.

medication, Ms. Curtis should look into sleep centers where experimental drugs were being tried.  R. 419.  Dr. Iyer also wrote a letter to Ms. Curtis on January 5, 2007 stating that until she controlled her narcolepsy, "it is unlikely that you will be able to have a gainful employment."  R. 421.

The ALJ conducted a hearing on January 8, 2007.  The two witnesses were Ms. Curtis and a vocational expert, William Harpool.  Ms. Curtis testified about her history and duties as a postal employee and teacher's aide.  She also discussed some of the difficulties that her conditions besides narcolepsy caused.

The ALJ confirmed that narcolepsy was Ms. Curtis' "basic problem."  R. 448. Ms. Curtis testified that there was no consistent onset of excessive sleepiness and that she might fall asleep ten times or three times by 9:00 a.m.  She sometimes had a warning of weak legs but sometimes just fell asleep without warning.  She testified as to what a "normal" day was.  She awoke at 5:00 a.m. after six hours of sleep.  She felt fine for one hour but tired quickly from there.  "Always by 9 o'clock I'm exhausted."  R. 451.  She stated that she tried to take a fifteen minute nap then, as suggested by her doctor.  After a short nap, she usually felt good for thirty minutes, but then, "I'm coming back to the same old thing."  R. 452.  Ms. Curtis also testified that she stopped driving at the beginning of 2006.  Between her diagnosis and that date she drove "very little."  R. 453-54.

The vocational expert testified briefly.  He defined Ms. Curtis' past work for the post office as a combination of post office clerk and mail clerk ,and the latter is a medium, semi-skilled job.  He confirmed that a person who had the restrictions noted in Dr. Whitley's report would be able to perform Ms. Curtis' past work.  R. 465-66.  The ALJ asked what would happen if a person's ability to maintain attention and concentration while doing their work was broken on a regular basis.  The vocational expert testified that the person "would be terminated normally for falling asleep or whatever."  R. 466.

*The Statutory Framework for Determining Disability*

To be eligible for the disability insurance benefits she seeks, Ms. Curtis must establish that she suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  Ms. Curtis was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her

in her immediate area, or whether she would be hired if she applied for work. 42 U.S.C. § 423(d)(2)(A).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Ms. Curtis was disabled under the Social Security Act the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520. The steps are as follows:

(1)    Has the claimant engaged in substantial gainful activity?  If so, the claimant was not disabled.

(2)    If not, did the claimant have an impairment or combination of impairments that are severe?  If not, the claimant was not disabled.

(3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)    If not, could the claimant do her past relevant work?  If so, the claimant was not disabled.

(5)    If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then the claimant was not disabled.  If not, the claimant was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

*Standard of Review*

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.   42 U.S.C. § 405(g).   Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.  42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by weighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  Where conflicting evidence allows reasonable minds to differ as

to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

The Commissioner must consider all relevant evidence and "may not select only that evidence that favors the ultimate conclusion."  *Nelson v. Apfel,* 131 F.3d 1228, 1237 (7th Cir. 1997).  In reaching a decision, the ALJ "must articulate, at least minimally, his analysis of the evidence so that this court can follow his reasoning."  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004), citing *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson*, 131 F.3d at 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

*The ALJ's Disability Determination*

Applying the five-step evaluation process, the ALJ found that Ms. Curtis was not disabled as defined by the SSA because she was able to perform her past relevant work.  The ALJ classified Ms. Curtis' narcolepsy and degenerative disc disease as severe impairments under the second step of the analysis.  None of the other conditions satisfied even the second step. The ALJ found, however, that despite these impairments, Ms. Curtis had a residual functional capacity to

perform medium work that was consistent with her past employment.  R. 17-20.

*Discussion*

I.  *Failure to Consider Critical Medical Evidence*

Ms. Curtis' request for judicial review is confined to whether the ALJ considered adequately the evidence as to whether she could work a job without falling asleep.  The ALJ must "build a bridge from the evidence to his conclusion." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) (remanding due to improper analysis of the medical evidence); accord, *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998) (remanding where ALJ had not stated reasons for ignoring seemingly pertinent parts of the medical record that supported claimant's contentions).  Ms. Curtis' main attack is on the ALJ's failure to consider at all the second multiple sleep latency test performed in 2006 showing an average sleep latency period of just forty-five seconds. The ALJ's only mention of that test was to list the test report in a string-citation of exhibits in a lengthy paragraph discussing Ms. Curtis' medical history and daily activities.  R. 18-19.  There is no other indication that the ALJ actually considered the evidence, especially since the ALJ chose to rely on the opinion of the non-specialist Dr. MacWilliams who apparently had no access to any of Ms. Curtis' records showing her narcolepsy when he examined her in 2005.  Nothing in the ALJ's paragraph related to a second multiple sleep latency test.

The ALJ's failure to consider properly the 2006 multiple sleep latency test is the most serious example of his failure to give proper weight to all the medical evidence before him.   The ALJ's decision that Ms. Curtis could work was based largely on the "great weight" he placed on the findings made by the state agency in November 2005.  T. 19.  This review, undertaken by Dr. Whitley and affirmed by Dr. Ruiz, listed no job impediments based upon Ms. Curtis' narcolepsy except for the need to work away from hazards.  Dr. Whitley's report was based solely on a review of the record and not based upon a personal examination of Ms. Curtis. The court recognizes that such physicians who review records are, as the Commissioner points out, "highly qualified physicians . . . who are also experts in Social Security disability evaluations."   20 C.F.R. § 404.1527(f)(2)(I).   But such opinions deserve little or no weight if they fail to address, for whatever reason, the key condition at issue.

The ALJ also relied on the opinion of Dr. MacWilliams who personally examined Ms. Curtis.  Dr. MacWilliams' report findings were echoed in the ALJ's residual functional capacity assessment.  This report, however, is deficient on the issue of narcolepsy.    Dr. MacWilliams categorized Ms. Curtis' medically documented condition of narcolepsy as "unconfirmed."  R. 298.  For some reason, Dr. MacWilliams did not have a record or communication from Ms. Curtis' physician.   Without those records, Dr. MacWilliams was left with only the claimant's word on her symptoms.  Without access to the medical records showing that she had been suffering from and treated by a sleep disorder specialist for

narcolepsy for the past four years, he made two observations.  First, Ms. Curtis did not fall asleep during the undocumented period of time she was at his office. Second, because she was still allowed to drive, Dr. MacWilliams concluded that "her physician apparently does not feel this to be a serious issue."  R. 298.[2]

The opinions the ALJ relied on stand in stark contrast to the opinion of Ms. Curtis' treating physician (the same one who supposedly did not take the narcolepsy seriously).  Dr. App wrote a letter specifically stating that he believed that Ms. Curtis was unable to work.  R. 197.  The letter alluded to Dr. App's more than four years of treatment and specifically stated that Ms. Curtis was an unsafe driver.  Dr. App also provided a letter dated March 10, 2006 stating that he had last treated Ms. Curtis in June 2005 and expressing his support for her disability claim.  R. 365.

The ALJ acknowledged the letters and medical records of Dr. App but chose not to give them "controlling weight" or, apparently, any weight at all.  The ALJ dismissed Dr. App's opinions because they were "not supported by the evidence

---

[2]Dr. MacWilliams' evaluation of Ms. Curtis' other purported conditions clearly left him skeptical of plaintiff's own account of her narcolepsy.  He determined that "submaximal effort" was the only explanation for her weakness in grip strength on the left side.  Without medical evidence of narcolepsy, it is not surprising that Dr. MacWilliams was skeptical.  No one doubts, and the ALJ specifically found, that at a bare minimum, the claimant suffered from narcolepsy. Undisputed medical records show serious symptoms that could not be controlled by a host of treatment choices, ultimately leading Dr. Iyer to recommend that Ms. Curtis resort to experimental treatments.  In light of this evidence, Dr. MacWilliams' understandable skepticism was misplaced.

of record, which shows that the claimant is capable of performing medium work."
R. 19.   This assertion is untenable, as it demonstrates no understanding or
consideration of the strength of the evidence supporting Ms. Curtis' claim.   With
this conclusory assertion, the ALJ failed to take the necessary next step of
explaining why he preferred Dr. Whitley's report.   *Zblewski v. Schweiker*, 732 F.2d
75, 78-79 (7th Cir. 1984) (remanding where, "in the absence of an explicit and
reasoned rejection of an entire line of evidence, the remaining evidence is
'substantial' only when considered in isolation").   See also *Bauer v. Astrue*,
532 F.3d 606 (7th Cir. 2008) (remanding where the ALJ had rejected the treating
physician's evidence in favor of the report of a non-examining consultant).   The
ALJ stated merely that he gave Dr. Whitley's report "great weight."   He also used
Dr. MacWilliams' report that Ms. Curtis was capable of doing medium work for
eight hours.   As shown above, however, Dr. MacWilliams had no medical evidence
of the claimant's narcolepsy.   In light of the entire record on the issue, his direct
opinion on the effects of Ms. Curtis' narcolepsy does not amount to substantial
evidence  upon which the ALJ could rely.

Dr. App's opinion is supported by the findings of three different doctors and
further specialized medical testing.   In the fourteen months between Dr. Whitley
and Dr. MacWilliams' reports and the hearing before the ALJ, Ms. Curtis met with
three separate doctors who were sleep specialists.   All found narcolepsy and
prescribed treatment.   A new multiple sleep latency test showed that her
narcolepsy had gotten worse since the original diagnosis in 2000, despite a wide

range of aggressive treatment prescribed by these specialists.  The narcolepsy confirmation came from Drs. Hasnain, Fletcher, and Iyer, with additional testing performed by Dr. Hasnain.  None provided a usable opinion specifically supporting Ms. Curtis' claim.[3]  All three doctors offered new drugs or plans for management showing that Ms. Curtis' narcolepsy was not controlled.

The Commissioner points out that the ALJ did not doubt the claimant suffered from narcolepsy.  The Commissioner then argues that the 2006 sleep study proved only that Ms. Curtis had narcolepsy.  Neither the study nor the analyses of the three sleep specialists from 2006 specifically noted that Ms. Curtis was incapable of working an eight hour work day.  This argument has some force, as the claimant herself worked for over two years after her initial diagnosis with narcolepsy.  Not all narcoleptics are incapable of holding jobs, of course.  It is well established that a diagnosis does not amount to a showing of total disability.  See *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) (noting that a diagnosis of fibromyalgia was insufficient, since fibromyalgia is not always disabling).

The problem with the ALJ's analysis is that he failed to address the entire 2006 record.  As noted, the ALJ cited the 2006 sleep study by exhibit number but

---

[3]The court does not consider the evidence first submitted to the Appeals Council.  See *Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 817-818 (7th Cir. 1993).  Plaintiff has not tried to meet the standards of sentence six of 42 U.S.C. § 405(g), which authorizes remands for new material evidence if the claimant had good cause for not submitting it earlier.  This evidence will be available on remand to the Commissioner.

never addressed its import.  The submissions of Dr. Iyer also appear in that long list of citations to exhibits, but the ALJ also did not discuss them.  The medical records of Drs. Hasnain and Fletcher did not receive even a bare citation.  In this case, "the failure so much as to mention the competent medical evidence . . . made the administrative law judge's explanation for his decision to deny benefits unacceptable."  *Groves*, 148 F.3d at 811; accord, *Herron v. Shalala*, 19 F.3d 329, 333 ("Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion.") (internal citations omitted).  The Commissioner's assertions are possible explanations, but they are mere speculation:  "principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."  *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), citing *SEC v. Chenery Corp.*, 318 US 80, 93-95 (1943).

The only response the ALJ offers to medical evidence in Ms. Curtis' favor is to state that it should be ignored because it is contrary to the 2005 findings of Dr. Whitley and Dr. MacWilliams.  The ALJ's conclusion is not supported by substantial evidence when the record is viewed as a whole.  The former was based on a review of records and not a personal examination of Ms. Curtis, and the latter resulted from an examination by a non-specialist who doubted she even had narcolepsy and had no access to the relevant medical records of testing and treatment.

The ALJ failed to evaluate the medical testimony properly.  The relevant considerations for evaluating medical testimony are found in 20 C.F.R. § 416.927. Both doctors relied on by the ALJ are qualified under 20 C.F.R. § 416.927(d), but the shortcomings in their foundations for considering the claimant's narcolepsy "underscore the importance to a rational decision of taking account of the other medical evidence in the record, especially the evidence given by a specialist in the relevant disease who actually examined the applicant." *Groves*, 148 F.3d at 811; see also *Bauer*, 532 F.3d at 608 (evaluating the relative weight of medical opinions in a bipolar case by noting:  "Given that there were two treating physicians, that they were both specialists in psychiatric disorders, and that they examined the plaintiff over a period of years, the checklist required the administrative law judge to give great weight to their evidence unless it was seriously flawed.").  Even if the ALJ had properly weighed the medical evidence, remand would still be needed because of the ALJ's failure to consider all of the evidence.  The two sources the ALJ relied on made their findings before three different doctors confirmed the diagnosis and offered new treatment ideas, which ultimately led to the despairing conclusion that Ms. Curtis should resort to experimental drug treatments, and before the 2006 multiple sleep latency test that showed her sleep latency time was substantially shorter than it had been in 2000, despite the years of expert treatment.

The Commissioner refers to several other parts of the ALJ's opinion for support.  First, the ALJ notes that Ms. Curtis did not fall asleep during the

hearing, nor did she fall asleep during her evaluation with Dr. MacWilliams. Those observations deserve little or no weight when compared with the evidence from Ms. Curtis' treating physicians.  See *Collord v. Heckler*, 633 F. Supp. 902, 907-908 (N.D. Ill. 1986) (reversing the ALJ where ALJ relied on the fact that neither claimant's doctor nor the ALJ had witnessed a narcoleptic or cataplexic event).  Although such "sit-and-squirm" observations by an ALJ are legally permissible, the results are not substantial evidence that Ms. Curtis could work an eight hour day, as she appeared before both Dr. MacWilliams and the ALJ for much shorter periods of time.  Compare *Powers v. Apfel*, 207 F.3d 431, 435-436 (7th Cir. 2000) (expressing serious concerns about the "sit and squirm" mode of analysis but allowing the ALJ to make the observation that a woman who said pain was unbearable while sitting for more than ten minutes had sat apparently comfortably for a longer period of time).

Second, the ALJ noted that plaintiff had missed three medical appointments during 2005 as evidence that her impairments "were not as severe as she has alleged."  R. 19.  The ALJ noted three appointments that the claimant missed in July, September, and October 2005.  Such evidence is theoretically relevant.  20 C.F.R. § 404.1529(c)(3).  But all three appointments were with Dr. Kantz, her general practitioner, not with the doctors treating her narcolepsy.  R. 389, 393, 397.  No evidence exists that these appointments had anything to do with her narcolepsy problems.  Furthermore, she saw Dr. Kantz on numerous other

occasions during this same period, six appointments between May 5, 2005 and November 29, 2005.[4]

II.    *Credibility Determination*

Given the other grounds for remand, it is unnecessary to resolve the credibility determinations of the ALJ.  Generally, the determination of credibility is a factual matter.  *Powers*, 207 F.3d at 435 (applying "special deference" to an ALJ's credibility determination); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (noting credibility determinations will not be upset on judicial review "so long as they find some support in the record and are not patently wrong").  The ALJ had an opportunity to observe the claimant's testimony, and the testimony admittedly contrasts with some of her previous medical complaints.

The credibility determination is complicated by other medical impairments cited by the claimant that the ALJ dismissed, but nothing in the ALJ's reasoning about credibility effectively rebuts her symptoms of narcolepsy.  The ALJ relied on

_____

[4]A closer examination of the record shows that the missed appointments had little or nothing to do with narcolepsy.  Ms. Curtis had an upper endoscopy on July 6, 2005, presumably for gastrointestinal issues.  A notation was made for "upper endoscopy @ 3 wks back."  R. 398.  Ms. Curtis missed an appointment twenty days later on July 26, 2005.  The second missed appointment was on September 28, 2005, but she appeared two days later on September 30, 2005, for a physical.  Her final missed appointment, October 6, 2005, was only seven days after her physical.  She was back in Dr. Kantz's office on November 29, 2005 for head and chest congestion.  These missed appointments for unrelated conditions do not reasonably suggest that Ms. Curtis did not take her narcolepsy seriously or failed to follow the care of her physician for narcolepsy.

four points.  First, he mentioned the sub-optimal effort theory of Dr. MacWilliams in his diagnosis of hand strength.  Second, he noted her failure to suffer episodes before Dr. MacWilliams or the ALJ.  Third, he mentioned the missed medical appointments.  Finally, he listed a series of daily activities that the plaintiff completed.  R. 18-19.  The plaintiff points out that she found most of these limited activities exhausting and that her ability to watch television, for instance, is not evidence that she could stay awake for eight hours.  See *Clifford*, 227 F.3d at 870 (remanding where ALJ emphasized daily activities as reasons to overrule medical testimony).  At best, the ALJ was arguing that minor credibility issues regarding her other symptoms rendered her entire testimony inaccurate, thus allowing the ALJ to dismiss completely her stated symptoms, both as recited at the hearing and in her various medical records.

The problem with the ALJ's decision, however, remains even if his credibility determinations were upheld.  He failed to weigh adequately the medical evidence and to determine the claimant's ability to stay awake for eight hours to perform a job.  See *Rosenboom v. Shalala*, 841 F.Supp. 341, 344-345 (D. Ore. 1993) (remanding where "the ALJ erred in failing to consider the effects which plaintiff's narcolepsy-related symptoms which are not medically controllable have on plaintiff's ability to perform her past relevant work").  The only evidence whether a person who falls asleep during the day can find a job in the workforce was a determination by the vocational expert that if she is unable to stay awake during the day, she would be "terminated normally for falling asleep or whatever."  R.

466.  The ALJ's finding on ailments besides narcolepsy are amply supported in the record and no longer contested.  Despite the great deference afforded the ALJ, the ALJ failed to consider adequately the evidence showing serious and uncontrolled narcolepsy, thus requiring remand.

*Conclusion*

For the foregoing reasons, the case is therefore remanded for further consideration of Ms. Curtis' narcolepsy in light of all the available evidence, and any other action necessary to issue a decision consistent with this entry.


So ordered.


Date: November 3, 2008

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Larry Schad
SCHAD &PALMER
lschad@schadlaw.com,sschad@schadlaw.com,mschad@schadlaw.com,jyoung@schadlaw.com

Tom Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, tracy.jones@usdoj.gov, lin.montigney@usdoj.gov